## SCOTT v. ASTORIA RAILROAD CO.

[72 Pac. 594.]

CHARGE TO JURY MUST BE CONSIDERED IN ITS ENTIRETY.

1. In passing upon the correctness of a single instruction or a part of a charge to a jury mere verbal slips should be disregarded, and the charge weighed as a whole.

RAILROADS—DANGEROUS LOCATION AS NEGLIGENCE.

2. A railroad cannot be charged with negligence in the location of its roadbed; hence an instruction that the action of a railroad company in constructing its track in a manifestly dangerous place, when, with reasonable care and at slight expense, it could have been constructed in a perfectly safe place, a few feet to one side, might be negligence which the jury could consider in determining the degree of diligence which the company should have exercised in watching, inspecting, and protecting its road, was erroneous, though in other parts of the charge the court correctly stated to the jury the degree of care required by the defendant in operating its road.

SUFFICIENCY OF EXCEPTION TO INSTRUCTIONS.

3. An exception to a part of a charge, particularly setting out the language complained of, is sufficient to raise the question of the accuracy of that part of the charge so specified.

GOVERNMENT WEATHER RECORDS AS EVIDENCE.

4. Records kept by public officers in the performance of their official duty, as, the amount of daily rainfall, or the velocity of the wind, recorded by officers of the United States Weather Bureau, are admissible in evidence to prove the facts therein stated.

SUMMARY OF MANY ENTRIES AS EVIDENCE.

5. Under the rule that a summary of many accounts or documents may be presented in lieu of the originals, where only the general result is desired as evidence (B. & C. Comp. § 703, subd. 5), an officer of the United States Weather Bureau may state the general results of the observations made at his station for a series of years, compiled from the entries made officially in the required records by the various persons who have been in charge of the station.

Expert Testimony on Slopes of Earthwork.

6. A competent civil engineer may, though he has never been directly employed in the building of railroads, give expert testimony as to the degree of inclination which should be given the slopes of railroad cuts or embankments in different soils and climates.

Scientific and Pfofessional Books as Evidence.*

7. Books on civil engineering are not competent evidence of the degree of slope that may safely be given to an earth embankment, and they should not be read to the jury.

Use of Scientific Books to Sustain an Expert.*

8. An expert may be permitted to give the names of authors on the subject under consideration who support the opinions he has expressed.

From Clatsop: Thomas A. McBride, Judge.

This is an action by Ella Scott, as administratrix of the estate of W. M. Scott, deceased, to recover damages for his death, which occurred January 12, 1901, while in the employ of the Astoria & Columbia River Railroad Company as a locomotive engineer, and is alleged to have been caused by its negligence in constructing its railroad too near a hillside, without adopting any means to prevent a slide, and in not properly watching its track, so as to discover the danger therefrom, and to warn the deceased thereof. The answer, after denying the material allegations of the complaint, alleges that the day the accident occurred was unusually stormy, the rainfall along the line of the defendant's railway being the heaviest of the season; that for more than two years prior thereto Scott had been in its employ as such engineer, was acquainted with the road and the construction thereof, and knew the nature, formation, and character of the country through which it extended, and the effect of rains thereon; that at the point where he lost his life no slide had ever occurred, but the road was necessarily constructed through a mountainous region, where slides frequently happen in the rainy season, against which it is impossible to guard, which fact he well

*Note.—With the case of *Union Pac. Ry. Co.* v. *Yates*, 40 L. R. A. 553, is a long note collecting and arranging the authorities on Scientific Books and Treatises as Evidence, in which the cases are classified under exact sciences, inexact sciences, law, and miscellaneous matters.— Reporter.

knew; that, during all the time he was so employed, defendant kept a competent track walker to examine the line before every train passed over it, who immediately preceded the train operated by Scott, examined the track, and found no obstruction thereon; that it was Scott's duty to exercise great care in running the engine, and on the night of January 12, 1901, he was informed that slides might possibly occur, in consequence of the heavy rainfall, and notified to proceed with caution, but, not heeding the direction, he ran the engine at a higher rate of speed than usual, and in such a careless manner that he could not stop it in time to avoid the disaster. For a second defense, it is alleged that Scott, knowing the character of the road and the effect of heavy rains thereon, assumed the danger incident thereto. The reply having denied the material allegations of new matter in the answer, a trial was had, resulting in a judgment for plaintiff in the sum of $4,000, and the defendant appeals.        REVERSED.

For appellant there was a brief over the name of *Fulton Bros.*, with an oral argument by *Mr. Chas. W. Fulton.*

For respondent there was a brief over the names of *George Noland* and *Bennett & Sinnott*, with an oral argument by *Mr. Alfred S. Bennett.*

MR. CHIEF JUSTICE MOORE, after stating the facts in the foregoing language, delivered the opinion.

It is contended by defendant's counsel that the court erred in instructing the jury as follows:

"The railroad company has a right to locate its road, in a general way, upon any route it may deem fit, but in making a specific location at any particular point it should use due care to provide a safe place for its employés to work; and if it construct its road in a place that is manifestly dangerous, when, with reasonable care and slight expense, it could just as well be constructed in a perfectly safe place, a few feet to one side, that may be negligence

which you would have a right to consider in determining
the degree of diligence and care defendant should have
exercised in watching, inspecting, and protecting its road,
and its employés thereon."

To render the application of this part of the charge in-
telligible, a brief statement of the facts involved is deemed
essential.   The bill of exceptions discloses that plaintiff
introduced testimony tending to show that the defendant
constructed a railway from Goble to Astoria, and operates
trains thereon, and also over the line of the Northern Pa-
cific Railway Company from Goble to Portland.   The de-
fendant's road near Bugby, for about half a mile, is built
along the south bank of the Columbia River, about ninety
feet from a cliff of basaltic rock, the disintegration of
which, and the débris carried over the precipice by sur-
face water, formed a slope of about 45 degrees, extending
from the face of the crag to a line parallel with, and about
six feet from, the track.   This incline was originally cov-
ered with brush and trees, which were cut down when the
railroad was built, and their stumps and roots had rotted.
In the rainy season, considerable water flows over the
precipice at this point; but, there being no ditch to carry
it off, the earth and débris composing the acclivity become
saturated therewith.   Slides have occurred in the imme-
diate vicinity prior and subsequent to the building of the
road, but the defendant made no attempt to carry away
the material of the slope, or to build retaining walls.   The
track walker, whose duty it was to inspect the line near
Bugby, was obliged to examine a section of eight miles,
and, to avoid being run down, was compelled to start on
his velocipede thirty minutes before train time, according
to schedule; and as the train was half an hour late on the
evening of January 12, 1901, no watchman had passed
over the track at that point within an hour of the train's
arrival.   Some time after the track walker passed Bugby,

a slide occurred, the rocks and earth lodging upon the track; and at about 10 o'clock that night the locomotive driven by Scott, and drawing a passenger train, ran into the obstruction, throwing the engine into the river whereby he was drowned.

It is argued by defendant's counsel that the court, in the instruction complained of, told the jury, in effect, that if the defendant could have located its road "in a perfectly safe place," but neglected to do so, a higher degree of care in operating it was demanded than in case they should find that such place could not have been discovered "a few feet to one side"; that, though the defendant might select the location of its road, it exercised the right to do so at its peril, and if a safer route than that chosen could have been discovered, but was not found, a different measure of care was required "in watching, inspecting, and protecting its road and employés"; that the degree of care imposed upon the defendant depended upon the wisdom exercised in locating its road; and that a jury, and not a railroad company, are the judges of where a line of railway shall be specifically located. Plaintiff's counsel maintain, however, that the exceptions taken to the instructions were general, and did not point out any particular part thereof of which the defendant complained, and that the charge should be considered in its entirety, and, when so construed, any seeming inconsistency therein is rendered harmless.

1. In construing the language employed by courts in charging juries in this state, a very liberal policy has been pursued; the rule being that, in considering a single instruction, the entire charge must be viewed, and; unless it appears that the jury were or might have been misled, mere verbal inaccuracies will not be sufficient cause for reversal: *Matlock* v. *Wheeler*, 29 Or. 64 (40 Pac. 5, 43 Pac. 867); *Smitson* v. *Southern Pac. Co.* 37 Or. 74 (60 Pac. 907);

*Farmers' Bank* v. *Woodell*, 38 Or. 294 (61 Pac. 837, 65 Pac. 520).

2. The court, in other parts of its charge, correctly instructed the jury that it was incumbent upon the defendant to exercise only reasonable and ordinary care ; saying in one instance :  " It is sufficient to defeat the right of the plaintiff to recover in this case that you should find from the evidence that defendant exercised such care as is common and usual under like circumstances and conditions, under prudent management." We think that notwithstanding the charge, as a whole, correctly informed the jury of the degree of care required of the defendant in operating its road, the instruction complained of might have misled them, for it seems to assume that negligence could be predicated upon the defendant's original location of the road. So many elements are to be considered in locating a railway, as factors in its construction and operation, that its permanent establishment must necessarily be left to its builders. To shorten distance, to increase speed, and to cheapen the cost of transportation of passengers and freight, railroad companies must occasionally cut long tunnels, build high trestles, and erect massive bridges, which might possibly be avoided in many instances by pursuing more circuitous routes. The demands of commerce necessitate the construction of railways in the places and manner indicated, and their location can never become a question to be submitted to a jury, for, if they could find that a certain line should have been deflected a " few feet to one side " of that determined upon by a railway company, where would be the limit to their power ? The question to be determined by the jury was whether the defendant had exercised the degree of care that the law enjoins, which is measured by the extent of danger incident to the building and operating of its road on the line selected, and not by considering whether a

safer location might possibly have been made elsewhere. We think the instruction complained of is manifestly erroneous, and might have misled the jury, by permitting them to consider as negligence the location of the road in the particular place in which it was built, though the court, in other parts of its charge, correctly instructed them as to the degree of care which it was necessary for the defendant to exercise.

3. The remaining question, on this branch of the case, is whether the exception is sufficient to bring up for review the error relied upon. The bill of exceptions shows that, at the conclusion of the charge to the jury, defendant's counsel excepted to the part thereof hereinbefore quoted, particularly setting out the language complained of. An exception to a charge is sufficient when it distinctly points out the particular parts to which it is directed: *Langford* v. *Jones*, 18 Or. 307 (22 Pac. 1064); *McAlister* v. *Long*, 33 Or. 368 (54 Pac. 194). Under the rule announced in those cases, we think the exception adequate to challenge that part of the charge of which the defendant complains.

In view of a new trial, it is deemed proper at this time to consider other alleged errors which it is claimed by defendant's counsel the court committed.

4. At the trial, plaintiff's counsel, desiring to show that the rainfall on the day Scott lost his life was not unusual, but such as might reasonably have been anticipated, and the effects thereof guarded against by the defendant when building its road, called B. Johnson, who, as agent at Astoria of the Weather Bureau, testified that it was incumbent upon him to keep a record of the rainfall in that city; and, producing a book containing such record, he stated that on January 12, 1901, 2.72 inches of water fell in the twenty-four hours ending at 5 o'cock P. M. of that day, which was the greatest daily rainfall that winter. He was then permitted to state, over defendant's objection

and exception, that such quantity was less than the average excessive daily precipitation, which was 3.30 inches; giving the date and quantity of water that had fallen on the day of the greatest rainfall during ten years, and also the average annual rainfall for eighteen years preceding 1901. The witness, upon cross-examination, having stated that the book to which he referred was kept, prior to March, 1897, by his predecessors, defendant's counsel thereupon moved to strike out those parts of his testimony that related to the average rainfall and to the entries made in the record prior to his assuming charge of the office, on the ground that they were hearsay and not based upon his personal knowledge. Johnson having been permitted further to testify, in answer to questions asked by plaintiff's counsel, that the book to which he referred was an official government record, compiled from smaller books in his office, the motion was denied, and an exception allowed. The book kept by the agents of the Weather Bureau at Astoria not having been offered in evidence, it could only have been used to refresh the memory of the witness by an examination of entries made therein by him, or by another under his direction; and, this being so, could he testify concerning any memoranda made prior to his taking charge of the office? The rule is well settled that a record kept by a person employed in the signal service of the United States, whose public duty it is to record truly the facts therein stated, is admissible in evidence to prove such facts: *Knott* v. *Raleigh & G. R. Co.* 98 N. C. 73 (3 S. E. 735, 2 Am. St. Rep. 321); *Chicago, etc. Ry. Co.* v. *Trayes*, 17 Ill. App. 136; *Moore* v. *Gaus & S. Mfg. Co.* 113 Mo. 98 (20 S. W. 975); *Evanston* v. *Gunn*, 99 U. S. 660. So, too, the record of the weather, kept for a number of years at a state public institution, is admissible to prove the meteorological condition of the atmosphere: *De Armond*

43 Or.—3.

*v. Neasmith,* 32 Mich. 231; *Hart* v. *Walker,* 100 Mich. 406
(59 N. W. 174).    In *Willis* v. *Lance,* 28 Or. 371 (43 Pac.
384, 487), an agent of the Weather Bureau was permitted
to testify concerning the direction and velocity of the
wind, from a record made in his office by an automatic
register.    So, too, in *State* v. *McDaniel,* 39 Or. 161 (65 Pac.
520), it was held that the testimony of an officer of the city
fire department that the fire bell did not ring on a certain
night before 12 o'clock, basing his knowledge on the fact
that the automatic indicator of the department did not
register a ringing of the bell, was competent.    It is possi-
ble, however, that the record made by automatic registers
may have consisted in hieroglyphics, which, if offered in
evidence, could have not been understood by the jury ;
thereby rendering the testimony of the officers, who pos-
sessed a knowledge of the symbols used, necessary to ex-
plain their meaning.    If this be so, the decisions in the
last two cases are not controlling in the case at bar, and
the legal principal involved must be considered in the
nature of *res nova.*

5. The adjudicated cases sustain the rule that the best
obtainable evidence should be adduced to prove every dis-
puted fact (*Mooney* v. *Holcomb,* 15 Or. 639, 16 Pac. 716);
the presumption being that higher evidence would be
adverse, from inferior being produced : B. & C. Comp.
§ 788, subd. 6.    The rule rejecting secondary evidence of a
writing is subject, among others, to the exception that
when the originals consist of numerous accounts, or other
documents, which cannot be examined in court without
great loss of time, and the evidence sought from them is
only the general result of the whole, oral evidence thereof
is admissible: B. & C. Comp. § 703, subd. 5.    It will be
remembered that the witness had with him a book showing
the quantity of rain that had fallen at Astoria each day
for eighteen years; and, courts being obliged to take judi-

cial notice of the laws of nature (B. & C. Comp. § 720),
it requires no proof to show that such a record, in this
state, would contain so many entries that an examination
of each would have occasioned great loss of time to the
court; and, as only the general result of the whole was
desired, we believe that the testimony objected to was ad-
missible, under the exception mentioned.   The record of
the meteorological observations at Astoria, prior to March,
1897, was made by Johnson's predecessors; but, as official
duty is presumed to have been regularly performed, the
entries noted in the book produced by the witness must
be treated as *prima facie* correct.   In *Evanston* v. *Gunn*,
99 U. S. 660, Mr. Justice Strong, commenting upon this
subject, says: "Extreme accuracy in all such observa-
tions, and in recording them, is demanded by the rules
of the signal service, and it is indispensable, in order that
they may answer the purposes for which they are required.
They are, as we have seen, of a public character, kept for
public purposes, and so immediately before the eyes of
the community that inaccuracies, if they should exist,
could hardly escape exposure."   In view of the public
character of the entries, and the presumption of their
verity, the witness was undoubtedly competent to state
the general result of the whole record from an inspection
thereof for the time embraced in the questions asked,
though all such entries were not made during his term,
for, as he was an expert in the manner of keeping the book
produced, he was qualified, and could therefore testify as
to the result of his examination and investigation : *State*
v. *Reinhart*, 26 Or. 466 (38 Pac. 822); *Salem Traction Co.*
v. *Anson*, 41 Or. 562 (67 Pac. 1015, 69 Pac. 675, 8 Mun.
Corp. Cas. 701).

6. W. J. Roberts, as plaintiff's witness, having testified
that he was a graduate of the University of Oregon, and
also of the Massachusetts Institute of Technology, where he

took a course in civil engineering, which branch, including'the science of railroad construction, he was engaged in teaching at the Agricultural College and School of Science at Pullman, Washington ; that he had practiced civil engineering fourteen years, and, though he had never been actively engaged in railroad building, he had constructed roads, irrigating ditches, canals, and other works requiring the construction of slopes ; that he was acquainted with the approved methods of civil engineers in relation to the construction of railroads and embankments; that, having visited the place where Scott lost his life, he measured the slope from its foot, at a point six feet from the track, to the bluff, and found it to be 105 feet, and its angle, where the surface was undisturbed by the slide, 46 degrees, —was permitted, over defendant's objection and exception, to state that there are certain standard slopes, approved by civil engineers, that are applicable to all kinds of known earth ; to detail the degrees of inclination recommended by a majority of such engineers for the construction of slopes in shallow or deep cuts, and in cohesive or immiscible soils ; and to give the names of several authors whose works on civil engineering coincided with his opinion. The admission of the testimony so objected to presents the question whether a witness who has no actual experience in railroad building, and whose knowledge thereof is derived from the study of works on civil engineering, is competent to express an opinion upon the degree of inclination of earthwork ; and, if so, can he properly refer to the authors whose works on the subject corroborate his opinion?

In *Boyle* v. *State*, 57 Wis. 472 (15 N. W. 827, 46 Am. Rep. 41), one Dr. Cody, in answer to a hypothetical question, was permitted, over objection and exception, to state that in his opinion a certain person had died from asphyxia; saying, however, that his conclusion was based

upon information derived from the perusal of medical books; that he had never seen a case of death from strangulation, and did not know, from experience, its post-mortem indications.    He was also permitted to be interrogated as follows: "Do you know, from books or otherwise, whether death is ever produced from strangulation without leaving marks upon the throat; that is, your own personal observation?" to which he replied: "In Taylor's Jurisprudence such cases are recorded.    Q. In standard medical works?    A. Yes, sir."    In that case, the defendant having been convicted, the judgment on appeal was reversed, the court holding that an error was committed in permitting an expert to testify as to statements contained in medical books; Mr. Justice Taylor saying: "The palpable error in permitting Dr. Cody [to answer the questions hereinbefore detailed] is apparent from the fact that he testified on the stand that he had no personal knowledge of the subject he was testifying about."    A new trial having been granted, the defendant was reconvicted, and appealed; and, in affirming the judgment, Mr. Chief Justice Cole, referring to the examination of medical witnesses, says: "They testified as to facts within their personal knowledge; also, probably, to matters derived from professional study and experience.    We suppose they could give their opinion as to the cause of the death of the deceased. * * When this case was here before, we did not intend to lay down any new rule as to expert testimony, and certainly did not, as an examination of the opinion of Mr. Justice Taylor will show": *Boyle* v. *State,* 61 Wis. 440 (21 N. W. 289).

In *Soquet* v. *State,* 72 Wis. 659 (40 N. W. 391), it was held, however, that a physician could not testify as an expert as to symptoms of arsenical poisoning, if his knowledge of the subject had been obtained wholly from medical or scientific books or medical instruction, and not from per-

sonal observation or experience. Mr. Justice ORTON, referring to the admission of the testimony of physicians whose knowledge of the symptons of arsenical poisoning was derived solely from medical or scientific books and from medical instruction, says : " In receiving their testimony, the court committed and repeated the very error by reason of which the judgment in the case of *Boyle* v. *State,* 57 Wis. 472 (15 N. W. 827, 46 Am. Rep. 41), was reversed." See, also, *Zoldoske* v. *State,* 82 Wis. 580 (52 N. W. 778). In *State* v. *Simonis,* 39 Or. 111 (65 Pac. 595), Mr. Chief Justice BEAN calls attention to the rule adopted in Wisconsin, and says : " But in an equally well considered opinion by the Supreme Court of Michigan (*People* v. *Thacker,* 108 Mich. 652, 66 N. W. 562), it is held that a practicing physician, who is a graduate of a reputable medical college, and who has sufficiently qualified himself to have a definite opinion of his own, may testify as an expert on the subject of poisoning, though it is not shown that he has had any experience in such cases." We believe the Michigan rule is founded upon better reason and supported by a greater weight of authority than that announced by the Supreme Court of Wisconsin. See, upon this subject, Gillet, Indir. & Collat. Ev. § 209 ; Rogers, Ex. Test. (2 ed.) § 1 ; *Citizens' Gaslight Co.* v. *O'Brien,* 118 Ill. 174 (8 N. E. 310); *Carter* v. *State,* 2 Ind. 617 ; *City of Fort Wayne* v. *Coombs,* 107 Ind. 75 (7 N. E. 743, 57 Am. Rep. 82); *State* v. *Terrell,* 12 Rich. Law, 321. An expert is a person who is so qualified, either by actual experience or by such careful study, as to enable him to form a definite opinion of his own respecting any division of science, branch of art, or department of trade, about which persons having no particular training or special study are incapable of forming accurate opinions or of deducing correct conclusions : *State* v. *Anderson,* 10 Or. 448 ; *Farmers' Bank* v. *Woodell,* 38 Or. 294 (61 Pac. 837, 65 Pac. 520); *State* v. *Simonis,* 39 Or. 111 (65 Pac. 595).

Though Roberts had no acquaintance with railroad build-
ing, his knowledge of the subject, derived from study of
works on civil engineering, and his experience in con-
structing roads, irrigating ditches, and canals, undoubt-
edly qualified him to express an opinion respecting the
"approved" slope of an embankment: *Central R. Co.* v.
*Mitchell*, 63 Ga. 173.

7. Whatever the rule may have been, it is now almost
universally conceded that medical books cannot, over the
objection of the adverse party, be introduced in evidence
to prove any statement contained therein: *City of Bloom-
ington* v. *Shrock*, 110 Ill. 219 (51 Am. Rep. 679); *Common-
wealth* v. *Sturtivant*, 117 Mass. 122 (19 Am. Rep. 401);
*Burg* v. *Chicago, R. I. & P. Ry. Co.* 90 Iowa, 106 (57 N. W.
680, 48 Am. St. Rep. 419); *Link* v. *Sheldon*, 18 N. Y. Supp.
815; *Lilley* v. *Parkinson*, 91 Cal. 655 (27 Pac. 1091). The
reasons usually assigned for the rejection of such a work
are that the statements which it contains lack the solem-
nity of a judicial oath; that the author, not being pres-
ent, cannot be cross examined; that, if he could be called
upon to state the grounds of the opinions so announced,
he might change or modify them; that several recognized
"schools" of medicine exist, that materially differ in theory
and practice; that the language used in medical books is
technical, and not capable of being understood by ordinary
persons, and that the practice of medicine and surgery is
changing, so that what was formerly regarded by the pro-
fession as settled has become in many instances obsolete,
or superior methods or more efficacious remedies have
been substituted therefor: *Ashworth* v. *Kittridge*, 12 Cush.
193 (59 Am. Dec. 178); *Gallagher* v. *Market St. Ry. Co.*
67 Cal. 13 (6 Pac. 869, 51 Am. Rep. 680, note). Historical
works, books of science or art, and published maps or
charts, when made by persons indifferent between the
parties, are primary evidence of facts of general notoriety

and interest : B. & C. Comp. § 770. There are certain facts constituting a species of evidence (B. & C. Comp. § 680) of such general notoriety that they are assumed to be already known to the court, and no evidence thereof need be produced : B. & C. Comp. § 719. In all cases in which judicial notice of facts may be taken by the court, if it is not sufficiently advised thereon, it may resort for its aid to appropriate books or documents for reference (B. & C. Comp. § 720), and declare its knowledge to the jury, who are bound to accept it as conclusive : B. & C. Comp. § 136; *State* v. *Magers*, 35 Or. 520 (57 Pac. 197). Though a court must take judicial notice of the laws of nature (B. & C. Comp. § 720), the probability of a landslide is not such a fact as a resort to appropriate books would enable the court to declare as conclusive to the jury. In determining the angle of repose of an embankment, the possibility of a slide depends upon the character of the material, the climatic influences thereon, and so many other elements that it cannot be said, as a matter of law, to be a fact of "general notoriety and interest," so as to render books on civil engineering primary evidence thereof : B. & C. Comp. § 770 ; *Gallagher* v. *Market St. Ry. Co.* 67 Cal. 13 (6 Pac. 869, 51 Am. Rep. 680).

8. These books not being admissible upon either of the grounds stated, the question to be considered is whether the court erred in permitting the witness to refer to them as tending to corroborate his opinion. In *Collier* v. *Simpson*, 5 Carr. & P. *73, decided at *nisi prius* in 1831, it was held by Mr. Chief Justice Tindal that, though medical books which were stated by expert witnesses to be standard authority in that profession could not be offered in evidence to prove any facts therein stated, such witnesses might be asked their judgment, and the grounds thereof, which might in some degree be founded on such books, as a part of their general knowledge. In *Central R. Co.* v.

*Mitchell,* 63 Ga. 173, an engineer, having been injured in a slide of earth upon a railroad track, instituted an action to recover the damages sustained, and called a civil engineer, who testified in relation to the character of the cut where the slide occurred, the effect of water upon the material, as tending to disturb it, and gave the angle of the steepest slope for which he knew any authority, saying: "The rules for construction of cuts, etc., which I have given, are found in books on engineering. I give these rules solely from what I recollect of the books. These rules are found in Mahan, Gillespie, and Gilmore, and many others." The plaintiff having secured a judgment, Mr. Justice JACKSON, speaking for the court, in affirming it, says, concerning the testimony of the civil engineer: "The expert was competent to testify. Every expert derives much of his knowledge from books as well as from experience, and can give his opinion based upon the knowledge acquired from both sources." In *Western Assur. Co.* v. *Mohlman Co.* 83 Fed. 811 (28 C. C. A. 157, 40 L. R. A. 561), upon an issue as to whether a building in which insured property was confined fell before a conflagration, or as a result of the fire, it was held that a civil engineer, testifying as an expert, may read in support of his opinion excerpts from engineering books recognized as standard authorities, giving the tabulated results of tests made to determine the strength and resisting power of timbers of the kind used in the construction of the building; the court saying: " The general proposition that scientific books are not to be read in evidence is a familiar one, and many citations from text writers and reported cases are found in the brief of the plaintiff in error. Nearly all the reported cases deal with medical works, and most excellent reasons for the application of the general rule in such cases may be found therein. But the rule is not of universal application. It would be a reproach to the admin-

istration of the law if it were so. Records of observations are undoubtedly secondary evidence, but, if all such records were excluded from the sources of knowledge available to a court of justice, it would frequently find itself unable to obtain information which was open to every individual in the community. It has been held repeatedly that standard life and annuity tables, showing at any age the probable duration of life, are competent evidence (*Railroad Co.* v. *Putnam,* 118 U. S. 554, 7 Sup. Ct. 1); and yet these tables show merely the deductions from records of past transactions, when neither the record of the transactions nor the individual who has worked out the deductions is called to testify to the accuracy of his work, or to the conditions under which it was performed. So, too, almanacs, astronomical calculations, tables of logarithms, interest tables, weather reports, tables of the rise and fall of the tide, have been admitted in evidence."

A text writer, discussing this subject, says: "Even by those courts who have been most resolute in excluding such works when offered substantively, it is agreed that an expert may show that his views are sustained by standard authorities in his profession": Wharton, Evidence, § 438. This author further says: "It has, indeed, been held that an expert, when called to state the sense of his profession on a particular topic, may cite authorities as agreeing with him": Wharton, Evidence, § 666. Professor Lawson, in his work on Expert & Opinion Evidence (2 ed. p. 176), says: "Notwithstanding the inadmissibility of the books, the opinions contained in them may go to the jury through the mouth of a witness—an expert." It will be generally admitted that standard works on civil engineering are treatises that relate more nearly to matters of an exact science than do medical books; but whether excerpts from the former can be read to corroborate the opinion of an expert witness, it is not necessary to inquire, for the ques-

tion is not involved herein.  Though the weight of current authority prevents the reading of scïentific books to contradict a witness generally, yet, when he bases his opinion upon the work of a particular author, such book may be read in evidence for that purpose: *Connecticut Mut. Life Ins. Co.* v. *Ellis*, 89 Ill. 516; *City of Bloomington* v. *Shrock*, 110 Ill. 219 (51 Am. Rep. 679); *Pinney* v. *Cahill*, 48 Mich. 584 (12 N. W. 862); *Marshall* v. *Brown*, 50 Mich. 148 (15 N. W. 55); *Huffman* v. *Click*, 77 N. C. 55; *City of Ripon* v. *Bittel*, 30 Wis. 614.   Plaintiff's counsel, by securing from Roberts a statement of the authors whose works on civil engineering supported the opinion of the witness, thereby invited his cross-examination, in which case the books to which he referred could have been read in evidence to contradict him.   True, it may be possible that a pretended expert might give an opinion upon a material fact, and fortify it by referring to the work of some fictitious author upon the subject; and, the adverse party being unable to secure the book mentioned, the reference of the witness might add to his false testimony a weight to which it was not entitled.   In the case at bar, however, no danger from the course of practice so assumed could have been possible, for Roberts was unquestionably a reputable witness, and thoroughly qualified to express an opinion upon the matter to which his attention was directed; and, in our opinion, it was proper to permit him to name the authors whose works on civil engineering coincided with his views.   But for the error committed in giving the instruction complained of, the judgment is reversed, and a new trial ordered.

REVERSED.